# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs September 20, 2010

## KATHLEEN ANNE DILLEY v. JAMES KEVIN DILLEY

**Appeal from the Circuit Court for Wilson County**
**No. 2008-CV-432     Clara W. Byrd, Judge**

---

**No. M2009-02585-COA-R3-CV - Filed May 23, 2011**

---

In this divorce case the father appeals the trial court's naming of the mother as the primary residential parent, the calculation of the mother's income for purposes of child support, and the trial court's valuation and division of marital assets. We find the record supports the trial court's decision to name the mother the primary residential parent. We further find the evidence does not preponderate against the trial court's valuation and division of the parties' marital assets. An equitable division of marital assets does not require an equal division between the parties, and the court did not abuse its discretion in this regard. The trial court did not err in calculating the parties' incomes for child support purposes. We conclude the mother is entitled to an award of some of the attorney's fees she incurred in this appeal. We affirm the trial court in all respects and remand the case for a determination of the amount of the mother's attorney's fees on appeal to be paid by the father.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Bert W. McCarter, Murfreesboro, Tennessee, for the appellant, James Kevin Dilley.

Susan M. Merry, Andrea Hagan, Lebanon, Tennessee, for the appellee, Kathleen Anne (Hansen) Dilley.

## OPINION

Kathleen Anne Dilley ("Mother") and James Kevin Dilley ("Father") received a Final Decree of Divorce on November 16, 2009 after being married for seven years. No children were born from this marriage, but Father had a child from a previous marriage whom Mother adopted when the child was nine years old. As part of the Final Decree, the trial court named

Mother the primary residential parent and adopted the Permanent Parenting Plan Mother proposed. Pursuant to the Child Support Worksheet, the court also ordered Mother to make monthly child support payments to Father in the amount of $707.

Father filed a notice of appeal claiming the trial court erred in (1) designating Mother as the primary residential parent; (2) excluding Mother's bonuses to calculate Mother's income for purposes of computing child support; and (3) valuing and dividing the parties' marital assets. Mother raises additional issues in her brief. She contends the trial court should have considered Father's business earnings when calculating Father's income for purposes of computing child support. Mother also seeks an award of her attorney's fees on appeal.

## I. PRIMARY RESIDENTIAL PARENT DETERMINATION

### A. STANDARD OF REVIEW FOR DOMESTIC RELATIONS CASES

Our review of a trial court's findings of fact in domestic relations cases is *de novo* upon the record of the trial court accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d 714, 732 (Tenn. 2005); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). We are mindful that trial courts have wide discretion in determining which parent should be the primary residential parent, and appellate courts will not disturb this determination unless the appellant can show the trial court abused its discretion. *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993); *see In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007) (citation omitted) (due to the discretion trial courts have in divorce cases and the fact-specific nature of these decisions, appellate courts are reluctant to second-guess a trial court's determination regarding the child's primary residence and visitation); *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996) (trial court's custody decisions "often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves," which appellate courts are reluctant to second-guess)*; Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997) (same); *see Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App.1997) (appellate courts will not disturb custody decision where trial court has observed witnesses and assessed their credibility unless court has abused its discretion).

Thus, unless Father can show the trial court abused its discretion in naming Mother the primary residential parent, we will not disturb this determination. To show the trial court abused its discretion, Father must show the court applied an incorrect legal standard or reached a decision contrary to logic or reasoning. *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007) (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)).

## B. TRIAL COURT'S FINDINGS OF FACT

In deciding to name Mother the primary residential parent, the trial court made the following findings of fact:

1. That the Court finds that Wife is entitled to the divorce based on Husband's admitted adultery with Ms. Ferguson.

2. That the Court finds that the Court had issued an Order enjoining both parties from having any paramours around the minor child and that the Husband moved in with Ms. Ferguson and has cohabitated since at least April of 2009 in violation of this honorable court's orders.

3. That the Court finds that the [child] is 16 years of age and has a serious drug problem and he needs intensive inpatient drug treatment. That the Court also finds that [the child] needs structure and supervision that the Mother has shown the ability to provide for minor child. That the Father is in denial about son's problems; Father's behavior at the school board hearing was unacceptable.[1] That the Court finds that Husband has continued to berate Mother in the presence of the minor child. That the Court finds that Husband's resentment toward the Wife has rubbed off on minor child during the pendency of this divorce.

4. That the Court does not believe minor child should live with Father on a full time basis because minor child believes he can do what he wants to do if he resides with Father. That the Court finds it is in the minor child's best interest to adopt the Permanent Parenting Plan presented by the Mother . . . . Further that Mother should have exclusive decision making authority. That Father should not have any veto power over Mother's ultimate decision making regarding the minor child. Mother shall schedule all appointments regarding the minor child's counseling and other necessary medical appointments. The Father shall have one more chance to get the minor child to his community services work and

---

[1] The child was arrested at school for possession of marijuana and pills. At a school board meeting to discuss their son's drug problems and whether the boy would be permitted to attend an alternative school, Father belittled Mother in front of the child. During this meeting Father said, "Kathy really hasn't been an engaged mother and real participatory in his . . . education or . . . personal welfare and . . . as far as contact, . . . I think in October and November, there were zero calls made to him."

counseling or the Court will consider removing Father's weekday parenting time.

5.      That the parties shall use email to communicate regarding the minor child and his appointments. That if Father is unable to assist getting the minor child to his community service, AA or other counseling appointments within the next thirty (30) days then the Court will adjust the parenting time. That the Court finds that the exact split parenting is not necessarily in minor child's best interest but that it is in his best interest for Mother to be named primary residential parent. That the Court has considered all factors listed in Tennessee Code Annotated in determining parental parenting of the parties' minor child.

## C. APPLICABLE STATUTORY PROVISIONS

Both Mother and Father rely on the factors set forth in Tenn. Code Ann. §36-6-106 in their arguments about whether or not the trial court erred in naming Mother the primary residential parent. However, Tenn. Code Ann. §36-6-404 was enacted to apply to divorces granted after July 1, 1997, with the result that we will consider the factors set out in the later statute.

Tennessee Code Annotated §36-6-404(a) provides that any final decree for divorce involving a minor child shall incorporate a permanent parenting plan. When parents do not agree on a permanent parenting plan, the court will adopt the plan that it determines is in the best interests of the child. Tenn. Code Ann. §36-6-404(c)(3). This more recent parenting plan legislation does not use the terms "custody" or "visitation," but instead establishes a parenting arrangement based on a schedule of when the child will reside with each parent. While the parenting plan legislation did not explicitly repeal the prior statutes on custody and visitation, it is clear the legislature intended courts to (1) adopt permanent parenting plans in all divorces involving minor children; (2) not award "custody" or "visitation" in cases where a parenting plan is required; and (3) apply a specific set of factors included in the parenting plan legislation when approving or designing a permanent parenting plan. *See* Tenn. Code Ann. § 36-6-404(b).

The factors the trial court is to consider when determining the child's residential schedule, as well as which parent shall be named the primary residential parent, include the following:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. . . .

(15) Each parent's employment schedule, and the court may make accommodations consistent with these schedules; and

(16) Any other factors deemed relevant by the court.

## D. EVIDENCE INTRODUCED AT TRIAL

During a four-day trial, the court heard testimony from Mother, Father, the child, and the child's therapists. The child testified he preferred to live with Father full time. The child explained that he is closer with Father and enjoys his time with Father. The child complained Mother was not very attentive and that he did not feel an emotional bond towards Mother.

However, the evidence showed the child has a drug problem, and that Mother, not Father, discovered the child was using illegal drugs. Once Mother informed Father of the child's illegal drug use, Father confronted the child about the drugs. The child denied taking illegal drugs, and Father believed the child without further questioning. Mother, not Father, has been the one to make sure the child attends AA meetings.

There was also evidence the child had stolen money from both Mother and Father that he had used to purchase illegal drugs. The child admitted to stealing $1,100 from Father that Father did not even notice was missing until Mother called and told him to check his bank statement. The child testified he had taken the psychedelic drug LSD while at Father's house. He also testified he had stolen Ambien pills from Mother's house, and that he took them to get high while he was at church before going to Father's house.

Despite his stated preference for living with Father, the child testified that Father kicked him out of his apartment one evening when the temperature outside was just 22 degrees. Even though the child had not spoken with Mother for a couple of months, the child knew Mother cared about him because he phoned her to come get him after Father kicked him out and he had nowhere else to go. There was also evidence Father was not reliable in

giving the child money for school lunches and that Mother gave him extra money to put into his account so he would have enough money to buy lunch every day at school.

While the child contended Mother did not pay him attention and spent all her waking time working, the child admitted Mother drove him and his girlfriend to the movies, and the child felt comfortable enough with Mother to invite his girlfriend over to her house. In addition, when the child had appointments to meet with a counselor in the mornings before school, Mother would drive the child to the counselor's office, wait outside until the session was over, and then drive the child to school. If Mother is working when the child gets out of school, she arranges for someone to pick the child up and bring him to her house. Mother also arranges for someone to supervise the child until she gets home so he does not get into trouble.

Following the close of evidence, the court reviewed the testimony and ruled as follows:

> Mrs. Dilley, the testimony has been she was not a very affectionate person, she is not a hugger, however, she has demonstrated to the Court her concern over this child. Continually, she has never asked for full custody of this child. She has always insisted that the custody of the child should be shared. Mr. Dilley has a great bond with his son. His son loves him and respects him. However his son defies both of them.
>
> The child would love to live with his dad full time . . . . When he is at Mrs. Dilley's he feels like he is always supervised, he doesn't like the "supervisor," no matter who it is. If it's Mrs. Dilley he is not happy with her. If she is not there and she has – if she is there he thinks she is not paying enough attention to him. If she is not there she is having someone else, paying someone else to watch him. He is not happy there. When he is at his dad's he says he is happy, he likes Ms. Ferguson and everything is fun and games over there.
>
> But he needs structure. He needs someone to watch him, to supervise him, to set boundaries. Mr. Dilley has been I believe in denial about his son's problems and has excused his son's drug problems. I find it totally unacceptable. When I read the transcript what Mr. Dilley stated at the school board hearing. Basically he took up for the child, that all of the child's drug problems were due to the death of his mother, to the death of his brother, to his adoptive mom who doesn't show affections towards him, blaming [the child's] problems on everyone except the child.

I find that totally unacceptable. I found it unacceptable that [Father] degraded Mrs. Dilley in front of the school board and in the presence of the child and other attorneys. After talking to [the child] I believe that [Father] has continued to degrade her in front of [the child] because [the child] will use some of the same descriptions that Mr. Dilley uses derogatory about Mrs. Dilley.

. . . . .

Mr. Dilley's attorney makes the argument that I should let [the child] do what he wants to do. Let him live with his dad. That's the exact reason he should not live on a full time basis with his dad. The problem is this child thinks he can do what he wants to do all the time and he believes that if he lives with his dad he will be able to do what he wants to do all the time. What he wants to do is not best for him. What he wants to do is take money that's not his, use it to purchase drugs, and to get high and that's not what we let teenagers do.

Pursuant to the terms of the parenting plan Mother proposed, the court named Mother the primary residential parent and awarded Mother and Father essentially equal parenting time: 182 days a year with Father and 183 days a year with Mother. The essence of Father's complaint on appeal is that the child is not happy living with Mother and that both Father and the child would prefer the child to live with Father full time.

The significance of custody and visitation arrangements are recognized as "among the most important decisions confronting a trial court in a divorce case." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn.Ct.App.2006) (quoting *Rice v. Rice*, M1998-00973-COA-R3-CV, 2001 WL 812258, at *2 (Tenn.Ct.App. July 19, 2001)); *In re Lamont B., II*, M2004-02027-COA-R3-JV, 2006 WL 1727332, at *3 (Tenn. Ct.App. June 23, 2006) (no Tenn. R.App. P. 11 application filed). In making such decisions, the needs of the child are paramount with the desires of the parent being secondary. *Chaffin*, 211 S.W.3d at 286. This determination is fact driven, and the trial court must consider all of the facts and circumstances involved in reaching its decision. *Id*.

Given the record before us, we conclude the preponderance of the evidence supports the trial court's decision and find no basis on which to reverse the trial court's determination that Mother should be the child's primary residential parent. Father has failed to demonstrate how the trial court applied an incorrect legal standard or reached a decision contrary to logic or reasoning.

## II. Calculation of Income for Child Support Purposes

Father next argues the trial court erred in calculating Mother's income for purposes of computing child support. Father contends the court should have included Mother's bonuses and stock options in addition to her base salary to determine her net income. For her part, Mother contends the court should have imputed Father's business income, not his previous salaried income, when calculating Father's net income for purposes of computing child support.

Awards of child support are governed by the Child Support Guidelines promulgated by the Tennessee Department of Human Services Child Support Service Division. *See generally* Tenn. Comp. R. & Regs. 1240-2-4; Tenn. Code Ann. §36-5-101(e)(2). Child support decisions may require the trial court to use its discretion in determining a parent's income for purposes of applying the guidelines, especially in cases where the court finds a parent is underemployed and credibility issues arise. Therefore, appellate courts review the trial court's child support decisions using the deferential abuse of discretion standard. *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005) (citing *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000) and *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999)). We will not reverse the trial court's decision unless we determine it is clearly unreasonable based on the facts of the case and the applicable law. *Richardson*, 189 S.W.3d at 725.

The trial court made the following findings of fact on this issue based on the testimony and documents introduced into evidence:

6. That the Court finds Mother's income should be based upon her gross base pay of Two Hundred Thousand ($200,000) Dollars per year or Sixteen Thousand Six Hundred Sixty Six 66/100 ($16,666.00) Dollars monthly. That the Court finds that Mother's bonuses depend on production and are not guaranteed and that Mother will have additional expenses in caring for the parties' minor child. The Court finds that the Husband is voluntarily underemployed; Husband has a college degree and Husband's 2006 W-2 of Seventy-Seven Thousand Eight Hundred Twenty Nine ($77,829.00) Dollars per year is the best evidence of the Husband's gross income. That Husband's income for child support purposes shall be considered at Six Thousand Four Hundred Eighty-Five and 75/100 ($6,485.75) Dollars monthly.

7. That the Court finds that Mother has been and will continue to maintain medical insurance on behalf of the minor child at the cost of One

Hundred Thirty Four ($134.00) Dollars per month. That Mother has to hire a supervisor for the minor child at the cost of seventy ($70.00) Dollars per week or Three Hundred Three ($303.00) Dollars per month.

The evidence at trial showed that Mother's salary changed from year to year, and that her current annual salary was $200,000. Mother had received bonuses in the past, but she testified her bonuses are based on the company's performance and she did not know whether she would receive any bonus for the 2009 year. With respect to Mother's stock options, the testimony by both Mother and a company representative was that the stock options have no current value.

Based on the record, we cannot say the trial court abused its discretion in basing Mother's income on her gross base pay of $200,000. *See Anderton v. Anderton*, 988 S.W.2d 675, 680 (Tenn. App. Ct. 1998) (trial court must assess credibility of parent who claims she will not receive bonus when she knows this will decrease her child support obligations). If Father has evidence that Mother received a bonus for the 2009 year that he believes alters her child support obligation, he can file a petition with the trial court to modify her child support obligations.

Turning to the court's determination of Father's income for purposes of determining child support, the court relied on Father's 2006 W-2. This showed Father earned $77,829 working at Cracker Barrel in 2006. Father currently owns and operates a lawn care business called Grasshoppers Lawn Care Service. His gross receipts for that business were $203,364 in 2008, yet he claimed his net income was only $20,847. The court addressed this as follows:

I know that [Mr. Dilley] has a college education and that when he worked for Cracker Barrel he was making well at least the last year I had, and I'm not sure it was a full year, but I had down when he worked at Cracker Barrel he made $77,829 in '06.

Now, we didn't have W-2s for any other year. Last year he had his '08 receipts in Grasshoppers Lawn Care Service. He showed a net of $20,847 which this Court is not going to find to be his income. I think that would be grossly understating his income. Especially when he paid his laborers $51,844. I just don't believe he would [be running] a business bringing in $203,000 and paying out the teenagers $50,000 a year and him not make more. However the best evidence I have of his, quote, income and the one we are going to use is the $77,829 a year. Because I know he is capable of earning that. I believe that's probably his highest – well, that's all the evidence I have

that may be the highest year but that's the best evidence I have he can earn at least that.

The Child Support Guidelines provide that to determine whether a parent is voluntarily underemployed, a court can consider the parent's education, training, and ability to work, as well as his past and present employment. Tenn. Comp. R & Regs. 1240-2-4-.04(3)(a)2.(iii).[2] A court finding an obligor parent willfully and voluntarily underemployed must make a finding as to the parent's potential earnings, taking into consideration the obligor's educational level and/or previous work experience. *Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996); *Herrera v. Herrera*, 944 S.W.2d 379, 387 (Tenn. Ct. App.1996); *Eatherly v. Eatherly*, No. M2000-00886-COA-R3-CV, 2001 WL 468665, at *11 (Tenn. Ct. App. May 4, 2001).

Courts are directed to allocate additional income to an underemployed parent to increase the parent's gross income to an amount that reflects the parent's income potential or earning capacity, and the increased amount is to be used for child support calculation purposes. Tenn. Comp. R & Regs. 1240-2-4-.04(3)(a)2.(ii). The additional income allocated can be based on the parent's past employment. *Id.* The court has the option of imputing additional gross income to an underemployed parent where there is no reliable evidence of income. *Id.* at 1240-2-4-.04(3)(a)2.(i).

Mother argues the trial court should have imputed income to Father based on the gross receipts from his lawn care business rather than imputing income based on his 2006 Cracker Barrel earnings. We do not believe a business's gross receipts are an appropriate measure of the owner's income. Pre-voluntary underemployment salary, however, is a reasonable measure. The Child Support Guidelines give the trial court a certain degree of discretion to choose how to allocate additional income to an underemployed parent based on the circumstances. We do not believe the trial court abused its discretion in this case by relying on Father's most recent W-2 to allocate additional income to him.

### III. VALUATION AND DIVISION OF MARITAL ASSETS

Father's final argument is that the trial court abused its discretion in setting values for and dividing the parties' marital assets. Specifically, Father challenges the trial court's valuation of the parties' marital home and the court's valuation of the Grasshopper Lawn Care Service. Father also questions the court's award to him of a 401(k) account valued at $17,700 that Father asserts was liquidated before the divorce action was filed.

---

[2] Father testified he has a college degree.

In divorce actions, courts are directed to make an equitable division of marital property upon the parties' request. Tenn. Code Ann. §36-4-121(a)(1). Marital property is defined as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce . . . ." Tenn. Code Ann. §36-4-121(b)(1)(A). Section 36-4-121(c) enumerates factors the court is to consider in dividing marital property, the final one being "[s]uch other factors as are necessary to consider the equities between the parties." Tenn. Code Ann. §36-4-121(c)(11).

Trial courts have wide discretion in dividing the marital estate. *Larsen-Ball v. Ball*, 301 S.W.3d 228, 234 (Tenn. 2010). They are in a better position than we are to observe the parties and determine their credibility. Therefore, we are reluctant to disturb a trial court's division of marital property unless there is insufficient evidence to support the trial court's decision or the division somehow results in an error of law or misapplication of statutory requirements. *Id*. We review the trial court's findings of fact *de novo* with a presumption of correctness and will uphold those findings unless the preponderance of the evidence points to the contrary. *Id*. at 234-35; *Pippin v. Pippin*, 277 S.W.3d 398, 403 (Tenn. Ct. App. 2008); *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); Tenn. R. App. P. 13(d).

## A. TRIAL COURT'S FINDINGS OF FACT

The trial court's findings of fact with respect to the property Father questions are as follows:

8. That the Court finds that the Wife purchased the real property . . . prior to the marriage with premarital funds in the amount of Sixty-One Thousand ($61,000) Dollars downpayment on the lot. That when the Wife refinanced the property there was a deed by the entireties which transmuted the property into marital property. That the Court finds both parcels of real property are marital property.

. . . . .

10. That the Court finds that the value of the [marital home] is Five hundred Thousand ($500,000) Dollars as based upon the Fair Market Value as of the day of trial as testified to by Mr. John Trice, certified appraiser. . . .

11. That the Court finds that it is appropriate to consider the cost of sale, expenses and commission at Ten (10%) percent of the Fair Market

-12-

Value of Six Hundred Sixty Thousand ($660,000) Dollars. Court finds after deducting the mortgage indebtedness and cost of sale, expenses and commission the net equity to be divided between the parties is Ninety One Thousand ($91,000) Dollars. Court finds that Wife's premarital downpayment in the sum of Sixty One Thousand ($61,000) Dollars is her separate property.

. . . . .

17. That the Court finds that the Fair Market Value of the lawncare business Grasshoppers Lawncare is Fifty Three Thousand One Hundred Twenty Two and 91/100 ($53,122.91) Dollars including but not limited to all tools, vehicles and equipment. That lawncare business shall be awarded to Husband.

. . . . .

21. That the Court finds that the Fair Market Value of the Husband's 401K is Seventeen Thousand Seven Hundred ($17,700) Dollars. That Husband's 401K shall be awarded to Husband.

### B. COURT OF APPEALS RULE 7

Initially, we note that Father has failed to comply with Rule 7 of the Rules of the Court of Appeals, which provides in relevant part:

(a) In any domestic relations appeal in which either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt, **the brief of the party raising the issue shall contain**, in the statement of facts or in an appendix, **a table in a form substantially similar to the form attached hereto. This table shall list all property and debts considered by the trial court**, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

(b) **Each entry in the table must include a citation to the record** where each party's evidence regarding the classification or valuation of the property or debt can be found and a citation to the record where the trial court's decision regarding the classification, valuation, division, or allocation of the property or debt can be found. (Emphasis added.)

Mother urges this Court to dismiss Father's challenge of the trial court's valuation and division of the parties' property based on his noncompliance with this rule, and there is authority to do so. *See, e.g. Wells v. Wells*, No. W2009-01600-COA-R3-CV, 2010 WL 891885, *4 (Tenn. Ct. App. 2010) (court is not required to address appellant's arguments regarding property division where appellant ignores requirements of Rule 7 of the Rules of the Court of Appeals); *Slaughter v. Slaughter*, No. W2007-01488-COA-R3-CV, 2008 WL 1970491, at *2 (Tenn. Ct. App. May 8, 2008) (this Court is under no duty to search the record to determine the value of the parties' property). The record in this case contains three volumes of the technical record, six volumes of transcripts, and 97 Exhibits. While we are tempted to dismiss this portion of Father's argument on appeal, we will address Father's concerns in light of our preference that cases be decided on their merits rather than on strict compliance with the rules.

### C. $61,000 DOWN PAYMENT

An "equitable" division of marital property is not the same as an "equal" division of marital property. Trial courts enjoy "wide latitude in fashioning an equitable division of marital property," *Altman v. Altman*, 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005), and a division of marital property is not inequitable just because it is not equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996).

Father initially argues the $61,000 Mother put down as a down payment for the lot where the parties' marital home was built should be treated as marital property rather than Mother's separate property. The evidence introduced at trial shows that Mother put a down payment on the lot in February 2001 using money she had saved over fifteen years' time.[3] It is not clear from the record whether Mother even knew Father when she purchased this property. Mother took out a construction loan and worked with an architect over the next year or so to build her "dream house." Father and his children did not move into Mother's house until the parties were married in May of 2002.[4]

The property stayed in Mother's name until she refinanced the loan on the property in 2006. The parties had purchased an adjoining lot that was unimproved before Mother refinanced the loan on the improved lot, and she decided to consolidate the loan on the land

---

[3] The record reflects Mother put $60,000 of premarital money into the property rather than $61,000. However, the court referred to this sum as $61,000 in its Findings of Fact and Final Decree, and the parties do not dispute this number. Therefore, for purposes of this discussion we will assume Mother made a down payment of $61,000 to purchase the lot where she built her house.

[4] When the parties married in May 2002 Father had two children from a previous marriage. His older child died in a car accident before the parties were divorced.

into the existing loan on the house during the refinancing. Mother testified that when she met with the loan officer at the bank, she explained that she owned the property from the time before the parties were married, that she wanted to keep the property in her name, and that she did not want Father's name to be on the property. However, the bank officer apparently told Mother it was the bank's policy that both spouses sign the deed of trust when refinancing, and so Mother ultimately permitted the property to be put into both her and Father's names.

In spite of Mother's testimony that she did not want Father's name on the house, she transferred an interest in both lots to Father in December 2006 with the result that Mother and Father held title to both lots as tenants by the entirety. The trial court therefore determined this jointly held property qualified as marital property. The court, however, treated separately the $61,000 Mother put towards the house when she first purchased the lot. The court noted that the majority of the debt and payments were made during the marriage, but the $61,000 down payment was from Mother's own premarital savings and therefore should not be treated as marital property.

Father argues the $61,000 should be designated marital property rather than Mother's separate property based on the doctrine of transmutation. According to this doctrine, property that was once separate becomes marital property when the one who initially owned the property treats the property as if it were marital property. A common example of transmutation is when property that was once held separately is put into the names of both spouses. When this occurs, there is a rebuttable presumption that the one who held the property separately has made a gift to the marital estate. *Woodward v. Woodward*, 240 S.W.3d 825, 829 (Tenn. Ct. App. 2007); *Batson v. Batson*, 769 S.W.2d 849, 858 (Tenn. Ct. App. 1988).

While there are facts that would support and facts that would not support the transmutation argument, determining that issue is not necessary. Even if the entire house and lot were determined to be marital property, it was subject to equitable division as part of the entire marital estate. Although the trial court awarded Mother the $61,000 as her separate property, it could easily have awarded it to her as part of her share of the marital assets. We will consider it marital property. Since Mother provided the $61,000 down payment from premarital savings, we conclude that the trial court properly exercised its discretion in awarding Mother this $61,000.

### D. VALUATION OF MARITAL HOME AND LAWN CARE BUSINESS

Father next contends the trial court erred in assigning values to the marital home and to the Grasshoppers Lawn Care business. Both Mother and Father presented evidence of the

-15-

value of the marital home. Father presented two appraisers who valued the house at $650,000 and $790,000, and Mother presented an appraiser who valued the house at $490,000. Mother testified she believed the house was worth $500,000. The court adopted Mother's value of $500,000.

Mother and Father also presented evidence of the value of the Grasshoppers Lawn Care business. Mother presented evidence of estimates she received for the business's vehicles and equipment, which totaled $53,122.91. Father testified he believed the business was worth $18,500. The court adopted Mother's valuation of the business.

When the parties present conflicting evidence of valuation, the court has discretion to value the property at issue from the range of values presented by the parties and their witnesses. *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007); *Koch*, 874 S.W.2d at 577. The values the trial court selected for both the marital home and the Grasshoppers Lawn Care business were within this range. We will therefore not disturb these findings.

### E. FATHER'S 401(K)

Father next complains about the court's award to him of a 401(k) account valued at $17,700. Mother testified that Father liquidated his 401(k) account after they separated and initiated the divorce proceedings. She testified he cashed the account out in March, put the money into the parties' business account, then spent the money once the complaint for divorce had been filed, without any input from Mother of how that money was to be used. Father testified he used the money after he moved out of the house in June 2008 to get an apartment, live in a hotel for a week or two, and pay some business expenses.

In the trial court's findings of facts, the court stated:

[Father] wasn't paying any marital bills throughout the entire divorce. Mrs. Dilley has made all of the house payments, all the interest payments, paid all the taxes, the insurance on the house, she paid all the credit cards, all the credit card interest. She has been paying him child support. Originally she was paying him like $1,100 a month and then we lowered it to $800 a month when she got joint custody and he had all of this money at his disposal. He got the child support and then come to find out he had like over $200,000 worth of gross receipts in his lawncare business. I don't know where he has dissipated the money but last year at the time when he had receipts of over $200,000 she was paying him child support, he still stole basically the money from the CD. He says he paid his attorneys with it. Well, he's had four so I don't know. And then he said he took out his 401k and used it to live in a hotel room.

-16-

Well, $17,000 would put me in a hotel room for a year I would think, not for three weeks.

The parties' testimony was unequivocal that Father's 401(k) did not exist when the court divided the marital assets, and that Father had used the proceeds from his 401(k) before the hearing on the parties' divorce. As we have previously explained:

> The trial court is only authorized to divide marital property that actually exists at the time of divorce, and it cannot create assets that do not exist. Property that was once owned by a spouse, either as separate or marital property, but not owned at the time of divorce, is not subject to classification or distribution because a court cannot divide or distribute what is not there.

*Marciante v. Perry*, M2006-02654-COA-R3-CV, 2008 WL 820502, at *7 (Tenn. Ct. App. March 26, 2008) (quoting *Gratton v. Gratton*, No. M2004-01964-COA-R3-CV, 2006 WL 794883, at *8 (Tenn. Ct. App. Mar. 28, 2006) and *Brock v. Brock*, 941 S.W.2d 896, 900 (Tenn. Ct. App. 1996)) (further citations omitted).

Because neither Father's 401(k) nor the proceeds from that account existed at the time the trial court divided the parties' marital assets, the court erred in awarding Father's 401(k) to Father. However, we do not believe any further action in the division of the marital assets by this court or the trial court is required. The trial court heard testimony that Father had used the funds from his 401(k) after the parties had separated and after the complaint for divorce had been filed. Father's argument challenging the award of this account is intended to support his argument that he did not receive an equitable share of the marital estate by reducing both the size of the estate and his share. However, Father is not entitled to one-half of the marital assets, only his equitable share. The trial court set out its reasons for crediting Father with the amount in the 401(k). Those reasons and the trial court's factual findings support the court's consideration of the funds withdrawn and spent by Father during the pendency of the divorce action. We believe the court equitably divided the marital assets between Mother and Father even if the 401(k) value is subtracted from the total value of the marital estate and from the value of Father's share.

### IV. MOTHER'S REQUEST FOR ATTORNEY'S FEES ON APPEAL

The final issue before us is Mother's request for an award of attorney's fees on appeal. Tennessee Code Annotated §36-5-103(c) allows a court to award a parent the reasonable attorney's fees he or she incurred "in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing . . . in the discretion of such court."

This statute applies to awards of attorney's fees incurred on appeal. *Pippin*, 277 S.W.3d at 407.

In addressing this issue in a similar case, this court has explained, "In determining whether an award for attorney's fees is warranted, we should consider, among other factors, the ability of the requesting party to pay his or her own attorney's fees, the requesting party's success on appeal, and whether the requesting party has been acting in good faith." *Shofner v. Shofner*, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004). In the exercise of our discretion, we conclude it is appropriate to award Mother those attorney's fees she incurred in this appeal on the issue of the residential placement of the parties' child. Based on our review of the appellate record and the relevant factors, we conclude that Mother is entitled to be awarded those fees. *See Sparkman v. Lyle*, No. M2008-01507-COA-R3-CV, 2009 WL 2567867, *5 (Tenn. Ct. App. Aug. 19, 2009) (court awarded Mother attorney's fees on appeal based on Mother's success on every issue on appeal and the good faith demonstrated by Mother throughout these proceedings). We therefore remand this case to the trial court to determine the appropriate amount of attorney's fees and to enter an award of those fees to Mother, to be paid by Father.

## V. CONCLUSION

We affirm the judgment of the trial court in all respects and remand this case to the trial court for the sole purpose of determining the reasonable amount of attorney's fees to award Mother for the appeal of this case on the issue of the child's residential placement. Costs of the appeal are taxed to Father, James Kevin Dilley, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

-18-